UNITED STATES OF AMERICA

            Plaintiff,

    vs.

EVANGELICAL COMMUNITY
HOSPITAL

and

GEISINGER HEALTH,

            Defendants.

Civil Action No.: 4:20-cv-01383-MWB

## <u>COMPETITIVE IMPACT STATEMENT</u>

The United States of America, under Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the "APPA" or "Tunney Act"), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I.      NATURE AND PURPOSE OF THE PROCEEDING

Defendant Geisinger Health ("Geisinger") and Defendant Evangelical Community Hospital ("Evangelical") entered into a partial-acquisition agreement (the "Collaboration Agreement") dated February 1, 2019, pursuant to which Geisinger would, among other things, acquire 30% of Evangelical. The United States filed a civil antitrust Complaint on August 5, 2020, seeking to rescind and enjoin the Collaboration Agreement. The Complaint alleged that the likely effect of Geisinger's partial acquisition of Evangelical would be to substantially lessen

competition and unreasonably restrain trade in the market for the provision of inpatient general acute-care services in a six-county region in central Pennsylvania, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

Before Defendants responded to the Complaint, the United States filed a Stipulation and Order and proposed Final Judgment, which are designed to remedy the loss of competition alleged in the Complaint. Under the proposed Final Judgment, which is explained more fully below, Geisinger is required to cap its ownership interest in Evangelical at 7.5%, and Defendants are required to eliminate other entanglements between them that would allow Geisinger to influence Evangelical. Defendants are also each required to establish robust antitrust compliance programs.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. Defendants

Geisinger is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its headquarters in Danville, Pennsylvania. Geisinger is a regional healthcare provider of hospital and physician services that operates twelve hospitals and owns physician practices throughout central Pennsylvania. It also operates a health insurance company, Geisinger Health Plan, which offers commercial health insurance, Medicare, and Medicaid products. Geisinger's annual revenue in 2019 was approximately $7.1 billion.

Evangelical is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its headquarters in Lewisburg, Pennsylvania. Evangelical operates a 132-bed independent community hospital, owns a number of physician practices, and operates an urgent-care center and several other outpatient facilities in central Pennsylvania. Evangelical's annual revenue in 2019 was approximately $259 million.

### B.     The Collaboration Agreement

On February 1, 2019, Geisinger and Evangelical entered into the Collaboration Agreement, pursuant to which Evangelical agreed to give Geisinger a 30% ownership interest. In exchange, Geisinger agreed to pay $100 million to Evangelical over the next several years for, among other things, Geisinger-approved investment projects, future investment projects that Geisinger had the right to approve, and intellectual property licensing.

Furthermore, Geisinger's contemplated investment in Evangelical would not have been passive: the Collaboration Agreement created additional entanglements between these two competitors and provided Geisinger with opportunities to influence Evangelical. For example, the Collaboration Agreement gave Geisinger rights of first offer and first refusal with respect to any future joint venture, competitively significant asset sale, or change-of-control transaction by Evangelical. It also gave Geisinger the right to approve Evangelical's use of certain funds provided by Geisinger. Additionally, the Collaboration Agreement provided mechanisms for Geisinger and Evangelical to share competitively sensitive information, such as requiring Evangelical to disclose business plans when requesting disbursement of certain funds and requiring Evangelical to inform Geisinger about planned transactions with other hospital systems before any such transactions were executed.

The Collaboration Agreement originally included other provisions granting Geisinger additional influence over Evangelical, which Defendants eliminated through several amendments during the course of the United States' investigation but before the United States filed its Complaint. For example, the Collaboration Agreement originally included provisions that gave Geisinger the right to appoint six individuals to Evangelical's board of directors as well as certain consultation rights on the appointment of Evangelical's chief executive officer. It also contained provisions that required Defendants to discuss and work toward joint ventures in service lines where they have historically competed, such as women's health and musculoskeletal care, and also required Geisinger to compensate Evangelical for certain financial losses.

### C.    Anticompetitive Effects of the Partial Acquisition

Defendants are two of the largest hospitals in a six-county region in central Pennsylvania. The vast majority of consumers of inpatient general acute-care services in and around Danville and Lewisburg, Pennsylvania, rely on Geisinger and Evangelical for their care. Together, the two hospitals account for approximately 71% of this six-county market and are each other's closest competitors for many services. Geisinger and Evangelical compete head-to-head for patients—including through investment in high-quality facilities and services, in negotiations with insurers, and through discounts to uninsured patients—and consumers have benefited from this competition through increased quality of care, broader availability, and lower costs.

As alleged in the Complaint, the partial acquisition of Evangelical by Geisinger resulting from the Collaboration Agreement would have created significant entanglements between Defendants, likely leading to increased coordination between them, higher prices, lower quality, and reduced access to inpatient general acute-care services in central Pennsylvania.

1.    The Relevant Market

As alleged in the Complaint, the provision of inpatient general acute-care services is a relevant product market.  Inpatient general acute-care services encompass a broad cluster of inpatient medical and surgical diagnostic and treatment services that require an overnight hospital stay, including many orthopedic, cardiovascular, women's health, and general surgical services.  The relevant market excludes outpatient services, which generally do not require an overnight hospital stay and are provided in settings other than hospitals.  The vast majority of patients who use inpatient general acute-care services would not switch to outpatient services in response to a price increase.  The relevant market also excludes more specialized services, such as advanced cancer services and organ transplants, which Evangelical does not offer.

As alleged in the Complaint, the relevant geographic market for the sale of inpatient general acute-care services is no larger than the six-county area that comprises the Pennsylvania counties of Union, Snyder, Northumberland, Montour, Lycoming, and Columbia.  This area includes the cities of Danville and Lewisburg, where Geisinger Medical Center and Evangelical are respectively located.  In general, patients choose to seek medical care close to their homes or workplaces, and residents of the six-county area alleged in the Complaint also generally prefer to obtain inpatient general acute-care services locally.  As a result, health insurers that offer healthcare networks in the six-county area generally do not consider hospitals outside of that area to be reasonable substitutes in their networks for hospitals within that area.  Because residents in the six-county area strongly prefer to obtain inpatient general acute-care services from within the six-county area, a health plan that did not have hospitals within the six-county area likely could not successfully attract employers and patients in the area.

2.      The Effects of the Collaboration Agreement on Competition

Geisinger and Evangelical are, respectively, the largest health system and largest independent community hospital in a six-county region in central Pennsylvania. For many patients in this region, Geisinger and Evangelical are close substitutes for the provision of inpatient general acute-care services

Robust competition between hospitals is important to American consumers. Hospitals such as Geisinger and Evangelical compete to be included in health insurers' networks and to attract patients by offering high-quality care, lower prices, and increased access to services. Geisinger and Evangelical, like other hospitals, also compete to provide superior amenities, convenience, customer service, and attention to patient satisfaction and wellness. The Collaboration Agreement would negatively impact all of those facets of competition to the detriment of consumers in central Pennsylvania.

a.  The Collaboration Agreement Would Create Financial Entanglements Between Defendants

Under the Collaboration Agreement, Geisinger would have acquired a 30% interest in Evangelical, its close rival. In exchange, Geisinger committed to pay $100 million to Evangelical over the next several years and would have remained a critical source of funding to Evangelical for the foreseeable future. This arrangement would establish an indefinite partnership between Evangelical and Geisinger, fundamentally altering their relationship as competitors and curtailing their incentives to compete independently for patients. As a result, Evangelical would be likely to avoid competing to enhance the quality or scope of the services it offers because they would attract patients from Geisinger, its part owner. It would also reduce Geisinger's incentives to compete by investing in improvements that would attract patients from

Evangelical. For example, if Geisinger were to expand its offerings or improve the quality of its services in areas in which it competes with Evangelical, it would attract patients at Evangelical's expense, reducing the value of Geisinger's 30% interest in Evangelical. As a result of the partial acquisition, both Defendants would have an incentive to pull their competitive punches.

If implemented, the Collaboration Agreement would also likely lead to Geisinger raising prices to commercial insurers and other purchasers of inpatient general acute-care services, resulting in harm to consumers. Before the partial acquisition, in the event of a contracting disagreement with an insurer, Geisinger risked losing patients to Evangelical, and this risk of loss disciplined the pricing that Geisinger negotiated with insurers. The same disciplining effect would occur when Geisinger raised prices to uninsured patients: in response to a price increase, Geisinger risked the uninsured patient moving to Evangelical for care, a result which would keep Geisinger from raising price. After it secured a 30% ownership interest in Evangelical, Geisinger would benefit to some degree when patients choose Evangelical over Geisinger for inpatient general acute-care services, since greater profits for Evangelical would increase the value of Geisinger's ownership interest in Evangelical. This ability to recapture a significant portion of the value of lost patients through its ownership of Evangelical would give Geisinger increased market power to charge higher prices to uninsured patients and greater bargaining leverage in negotiations over reimbursement rates with insurers. Insurers who pay higher reimbursement rates to Geisinger would pass along higher healthcare costs to consumers.

    b.  The Collaboration Agreement Would Give Geisinger Undue
         Influence Over Evangelical

The Collaboration Agreement would give Geisinger the ability to influence and exert control over Evangelical and how Evangelical competes in central Pennsylvania. In addition to

the influence gained by virtue of Geisinger's $100 million investment and 30% ownership interest in Evangelical, the Collaboration Agreement would give Geisinger influence over Evangelical's ability to partner with others in the future.  Geisinger would have rights of first offer and first refusal with respect to several types of transactions that Evangelical may wish to pursue, including any future joint venture between Evangelical and another entity, any competitively significant asset sale by Evangelical, and any transaction involving a change-of-control of Evangelical.  These provisions would provide Geisinger with advance notice of Evangelical's competitive plans and the opportunity to interfere with Evangelical's ability to engage in such transactions, and thus deter potentially procompetitive collaborations between Evangelical and other healthcare entities that compete with Geisinger—arrangements that could otherwise benefit patients and the community.

The Collaboration Agreement would also enable Geisinger to influence Evangelical through Geisinger's right to approve or deny Evangelical's use of certain funds provided by Geisinger, as Geisinger could withhold that approval if the expenditure threatened Geisinger's business.  The Collaboration Agreement also included other entanglements, such as providing Evangelical with perpetual licenses to Geisinger's IT systems at no cost to Evangelical and proposing joint ventures in service lines such as women's health and musculoskeletal care, where Geisinger and Evangelical have historically competed.  Maintaining these entanglements would reduce the incentives for Geisinger and Evangelical to compete aggressively on the quality, scope, and availability of inpatient general acute-care services.

c.    The Collaboration Agreement Would Enable the Sharing of
              Competitively Sensitive Information

The Collaboration Agreement also provided the means and opportunity for Defendants to share competitively sensitive information.  Under its terms, Evangelical was required to inform Geisinger about partnerships, joint ventures, and transactions with other healthcare entities before those transactions were executed so that Geisinger would have the opportunity to invoke its rights of first refusal or first offer.  The Collaboration Agreement further required that, when Evangelical requested that Geisinger disburse funds from its $100 million commitment for strategic projects, Evangelical would be required to provide Geisinger with supporting business plans, and Geisinger could grant or withhold approval for certain capital projects.  These requirements would enable Geisinger to secure important forward-looking information about Evangelical's plans to compete with Geisinger.  Requiring Evangelical to give Geisinger a preview of its future competitive endeavors would likely soften competition between Geisinger and Evangelical, diminish Evangelical's incentives to innovate and expand, and impede Evangelical's ability to enter into strategic alliances with others to compete with Geisinger in the future.

        d.    Entry or Expansion is Difficult

Entry of new competitors or expansion of existing competitors is unlikely to prevent or remedy the anticompetitive effects of the Transaction.  The construction of a new hospital that offers inpatient general acute-care services in the relevant geographic market would require significant time, expenditures, and risk.  In the six-county region where Defendants compete, no new hospitals have been built for more than ten years, and one closed in March 2020.  Entry by a

new hospital in the relevant market is unlikely due to declining demand for inpatient general acute-care services and low population growth.

### III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The purpose of the proposed Final Judgment is to remedy the loss of competition alleged in the Complaint and to ensure Evangelical and Geisinger remain independent competitors.  The relief required by the proposed Final Judgment will remedy the loss of competition alleged in the Complaint by ensuring that Evangelical remains an independent competitor in the market for inpatient general acute-care services in central Pennsylvania.  The proposed Final Judgment will restore competition by: (1) capping Geisinger's ownership interest in Evangelical; (2) preventing Geisinger from exerting control or influence over Evangelical; and (3) prohibiting Geisinger and Evangelical from sharing competitively sensitive information—all of which will restore Defendants' incentives to compete with each other on quality, access, and price.  At the same time, the proposed Final Judgment permits Evangelical to use Geisinger's passive investment for specific projects that will benefit patients and the community.  Finally, Defendants are required to institute antitrust compliance programs.

### A.    Reduction of Ownership Interest and Investment

First and foremost, the proposed Final Judgment caps Geisinger's ownership interest in Evangelical to a 7.5% passive investment.  Paragraph IV.A. renders the Collaboration Agreement, including its provision for Geisinger to obtain a 30% ownership interest in Evangelical, null and void.  In its place, Defendants have entered into an Amended and Restated Collaboration Agreement that is consistent with the terms of the proposed Final Judgment. Paragraph IV.B.2. prohibits Geisinger from increasing its ownership interest in Evangelical above the 7.5% cap that was obtained in exchange for the approximately $20.3 million already

paid by Geisinger to Evangelical, and Paragraph IV.B.3. prohibits Geisinger from making any loan or providing any line of credit to Evangelical. Paragraph V.A. of the proposed Final Judgment permits Evangelical to use the $20.3 million it has already received from Geisinger only for two specified projects, improving Evangelical's patient rooms and sponsoring a local center for recreation and wellness. Under Paragraph IV.F., Defendants may not amend the Amended and Restated Collaboration Agreement without the consent of the United States.

In addition, by limiting Geisinger's ownership interest in Evangelical and prohibiting Geisinger from making any loans to Evangelical, Paragraphs IV.B.2. and IV.B.3. of the proposed Final Judgment restore Geisinger's incentives to compete on price in negotiations with commercial insurers. Limiting the ownership interest and prohibiting loans substantially reduces any bargaining leverage Geisinger would gain from recapturing the profits from any patients lost to Evangelical. Similarly, these provisions preserve Defendants' incentives to compete aggressively with each other as they have in the past for the business of uninsured consumers.

As applied to the facts alleged in the Complaint, the limitations imposed on Geisinger's ownership interest and investment in Evangelical—along with the removal of significant entanglements between the Defendants discussed below—render Geisinger's interest passive, eliminate mechanisms for Geisinger to influence its smaller competitor, and restore the incentives of both hospitals to continue to compete with one another to provide inpatient general acute-care services for the benefit of patients and health insurers. Following entry of the proposed Final Judgment, Geisinger will not be in a position to prevent other healthcare entities from acquiring or partnering with Evangelical, and Geisinger's limited investment will benefit patients and the community by partially financing Evangelical's modernization of its patient rooms and providing funding for wellness and recreation at the Miller Center.

11

### B. Prohibitions Against Geisinger's Influence and Control Over Evangelical

The Collaboration Agreement contained numerous provisions that gave Geisinger the ability to influence and control its close competitor, Evangelical, through management positions and other means. For example, as originally crafted, the Collaboration Agreement gave Geisinger the right to appoint six members to Evangelical's board of directors. The proposed Final Judgment prohibits attempts to reinstate such provisions during the ten-year term of the proposed Final Judgment in order to prevent Geisinger from exerting influence or control over Evangelical in the future.

Paragraphs IV.B.1. and IV.C. of the proposed Final Judgment, respectively, prevent Geisinger from appointing any directors to Evangelical's board of directors and prevent Evangelical from appointing any directors to the board of directors of Geisinger or Geisinger Health Plan. Paragraph IV.B.4. prevents Geisinger from obtaining any management or leadership position with Evangelical that would provide Geisinger with the ability to influence the strategic or competitive decision-making at Evangelical. Paragraph IV.D. prevents Defendants from consulting with each other regarding decisions to employ individuals in executive-level positions. These provisions in the proposed Final Judgment prevent Geisinger from exercising influence over Evangelical through participation in its governance, management, or strategic decision-making, which would render Evangelical a less independent competitor.

The proposed Final Judgment also prohibits Geisinger from otherwise influencing Evangelical, preserving its competitive independence. Paragraph IV.B.5. of the proposed Final Judgment prevents Geisinger from maintaining or obtaining any right of first offer or first refusal regarding any proposal or offer to Evangelical, including proposals to enter into future joint ventures with other entities, competitively significant asset sales, or change-of-control

12

transactions by Evangelical. As alleged in the Complaint, having rights of first offer and first refusal would enable Geisinger to interfere if Evangelical attempted to enter into such transactions and would deter collaborations between Evangelical and other entities. Prohibiting the use of such rights eliminates an entanglement between Geisinger and Evangelical that would reduce Evangelical's incentive and ability to compete vigorously.

Paragraph IV.B.6. prohibits Geisinger from controlling Evangelical's expenditure of funds, including Evangelical's choice of strategic project investments. Paragraph IV.B.6. also prohibits Geisinger from providing a guaranty to Evangelical against any financial losses. In addition, Paragraph IV.B.3. prohibits Geisinger from making a loan or extending a line of credit to Evangelical. These provisions ensure Evangelical's financial independence. Paragraph IV.B.7. prohibits Geisinger from licensing its information technology systems to Evangelical without the consent of the United States, except for information technology systems and support permitted under Paragraph V.B., subject to a firewall to prevent the sharing of competitively sensitive information. These provisions enable Evangelical to improve its hospital operations and patient care in order to be a more effective competitor while limiting Geisinger's ability to influence Evangelical.

Finally, to maintain their competitive independence, Paragraph IV.E. prevents Defendants from entering into any joint ventures with each other, including those contemplated in the Collaboration Agreement in certain service lines where Defendants historically competed, and from renewing, extending, or amending their joint venture to operate a recreation and wellness center called the Miller Center in Lewisburg, Pennsylvania, without the prior written consent of the United States. Exempted from this prohibition, however, are the renewal or extension of two joint ventures already in place—Evangelical-Geisinger, LLC, a joint venture

13

between Geisinger and Evangelical to provide student health services to Bucknell University and the Keystone Accountable Care Organization, LLC, an organization of doctors, hospitals, and other providers, that provides coordinated care to Medicare Patients. Defendants, however, may not otherwise amend these two pre-existing joint ventures without the prior written consent of the United States.

Collectively, these provisions in the proposed Final Judgment remove Geisinger's ability to exercise influence or control over Evangelical. Defendants' incentives to compete with each other are preserved by eliminating all of Geisinger's rights to influence or control decision-making at Evangelical, removing other entanglements from the Collaboration Agreement, and capping Geisinger's equity stake in Evangelical to a 7.5% passive investment. The terms of the proposed Final Judgment maintain Evangelical's independence as a competitor, substantially reduce the likelihood that Defendants' competitive incentives will be affected by Geisinger's partial ownership, and preserve Defendants' incentives to compete with each other on the price, quality, and availability of services.

### C.     Prohibitions Against Sharing Competitively Sensitive Information

The Collaboration Agreement would have provided the potential for increased coordination between Geisinger and Evangelical arising from the sharing of sensitive, forward-looking confidential information about Evangelical's plans to compete with Geisinger. The proposed Final Judgment requires that the provisions in the Collaboration Agreement that would have provided Geisinger with the ability to access Evangelical's competitively sensitive information be eliminated in order to prevent Defendants from coordinating with one another using that information. Paragraph IV.G. of the proposed Final Judgment prohibits the Defendants from providing each other with non-public information, including any information

about strategic projects being considered by either Defendant.  It also prevents Defendants from

having access to each other's financial records.  By preventing Defendants from sharing this

information, this provision decreases the possibility of anticompetitive coordination between

Defendants and helps maintain their incentives to compete with one another.  This provision,

however, allows Defendants to exchange non-public information that is necessary for the care

and treatment of patients.  In addition, Paragraph IV.B.5. prohibits Defendants from exercising

or maintaining any rights of first offer and first refusal that would allow Geisinger to receive

advance notice about Evangelical's competitive plans through exercising such a right.

### E.    Permitted Conduct

Paragraph V.A. of the proposed Final Judgment permits Evangelical to retain the $20.3

million Geisinger already provided to Evangelical, defined in the proposed Final Judgment as the

Existing Financial Payment, but only for the purpose of expending it on Evangelical's PRIME

patient room improvement project ($17 million) and to sponsor the Lewisburg YMCA at the

Miller Center in Lewisburg, Pennsylvania (approximately $3.3 million).  These projects will not

impede competition between the parties and will benefit the community.

Paragraph V.B. of the proposed Final Judgment permits Geisinger to provide certain

information technology systems and support to Evangelical at a discounted rate to enable

Evangelical to upgrade its electronic health records systems.  The proposed Final Judgment also

permits Geisinger to provide Evangelical access to various back office software systems at

commercially reasonable rates.  Evangelical has been unable to accomplish such upgrades on its

own because of its status as a small independent community hospital.  Permitting Evangelical to

obtain this electronic medical records upgrade and related support from Geisinger at a discount

will benefit patients in central Pennsylvania and promote the adoption of health information

technology to improve the delivery of care to patients.  Geisinger's provision of upgraded health records software and other support software to Evangelical is unlikely to prevent Evangelical from collaborating with other healthcare providers.  The requirement in Paragraph VII.A. that Defendants implement and maintain a firewall will prevent them from sharing competitively sensitive information.

     **F.**     **Antitrust Compliance Program and Firewall**

Defendants are required to institute an antitrust compliance program to ensure their compliance with the Final Judgment and the antitrust laws.  Under Section VI of the proposed Final Judgment, each Defendant must create an antitrust compliance program that is satisfactory to the United States to ensure that Defendants comply with the Final Judgment.

Defendants must designate an Antitrust Compliance Officer who is responsible for implementing training and antitrust compliance programs and ensuring compliance with the Final Judgment.  Among other duties, each Antitrust Compliance Officer will be required to distribute copies of the Final Judgment to each of Defendants' respective management, among others, and to ensure that relevant training is provided to each Defendants' management as well as individuals with responsibility over Defendants' information technology systems.  Defendants are each required to certify compliance with the Final Judgment and the requirements of the antitrust compliance programs annually on the anniversary of the entry of the Final Judgment.

Under Section VII, Defendants are required to implement and maintain a firewall to prevent competitively sensitive information from being disclosed in the course of Geisinger's provision of electronic medical records and other IT systems and services to Evangelical. Defendants must provide their compliance plan for the firewall to the United States for approval,

and the United States maintains the right to seek the Court's determination as to sufficiency of the Defendants' proposed compliance plan for the firewall.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.  Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later.  All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment.  The

comments and the response of the United States will be filed with the Court.  In addition,

comments and the United States' responses will be published in the *Federal Register* unless the

Court agrees that the United States instead may publish them on the U.S. Department of Justice,

Antitrust Division's internet website.

Written comments should be submitted to:

> Eric D. Welsh
> Chief, Healthcare and Consumer Products Section
> Antitrust Division
> U.S. Department of Justice
> 450 Fifth Street NW, Suite 4100
> Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action,

and the parties may apply to the Court for any order necessary or appropriate for the

modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial

on the merits challenging the partial acquisition.  The United States could have continued this

litigation and sought preliminary and permanent injunctions against Geisinger's acquisition of

partial ownership of Evangelical and the accompanying entanglements in the Transaction.  The

United States is satisfied, however, that the relief described in the proposed Final Judgment will

remedy the anticompetitive effects alleged in the Complaint, preserving competition in the

market for inpatient general acute-care services in the six-county area in Pennsylvania identified

in the Complaint.  Thus, the proposed Final Judgment achieves all or substantially all of the

relief the United States would have obtained through litigation, but avoids the time, expense, and

uncertainty of a full trial on the merits of the Complaint.

## VII.   STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).  In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the

APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. *Id.* at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron*

*Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case.").  The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'"  *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case."  *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged.").  Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to

"effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237, § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene," 15 U.S.C. § 16(e)(2). *See also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII. DETERMINATIVE DOCUMENTS

The only determinative documents or materials within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment are the Collaboration Agreement, dated February 1, 2019, and the Amended and Restated Collaboration Agreement, dated February 18, 2021.

Dated: March 3, 2021                    Respectfully submitted,

                                        PLAINTIFF UNITED STATES OF
                                        AMERICA


                                        /s/ Natalie Melada
                                        NATALIE MELADA
                                        DAVID M. STOLTZFUS
                                        CHRIS S. HONG
                                        DAVID C. KELLY
                                        GARRETT LISKEY

                                        Attorneys for the United States
                                        U.S. Department of Justice
                                        Antitrust Division
                                        450 5th Street, NW, Suite 4100
                                        Washington, D.C. 20530
                                        Tel.: (202) 353-1833
                                        E-mail: natalie.melada@usdoj.gov

## CERTIFICATE OF SERVICE

I, Natalie Melada, hereby certify that on March 3, 2021, I electronically filed the

foregoing Competitive Impact Statement through the Court's CM/ECF system.  I certify that all

participants in the case are registered CM/ECF users and that service will be accomplished by

the CM/ECF system.


/s/ Natalie Melada
Natalie Melada
Trial Attorney
U.S. Department of Justice
Antitrust Division
Healthcare and Consumer Products Section
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
natalie.melada@usdoj.gov